OPINION
{¶ 1} This matter comes for consideration upon the record in the trial court, the parties' briefs, and their argument to this court. Appellant, Jolando Sims ("Sims"), appeals the judgment of the Lake County Court of Common Pleas finding him guilty of breaking and entering, a fifth degree felony, following a jury trial and sentencing him to ten months in prison. The issues we must decide are: 1) whether the trial court erroneously instructed the jury on complicity and stealth; 2) whether the verdict finding Sims guilty of breaking and entering was against the manifest weight of the evidence; 3) whether the trial court erroneously admitted photographs depicting Sims with his hands behind his back; and 4) whether the trial court erroneously deviated from the minimum sentence. Because we answer all these questions in the negative, we affirm the decision of the trial court.
 {¶ 2} Sims was indicted by the Lake County grand jury on one count of breaking and entering, a fifth degree felony, in violation of R.C.2911.13(A), and one count of possessing a criminal tool, to wit: a flashlight, a fifth degree felony, in violation of R.C. 2923.24, to which Sims entered a plea of not guilty.
 {¶ 3} Sims subsequently filed a motion in limine seeking to prohibit the state from referring to any photograph that depicted him with his hands handcuffed behind his back. Specifically, Sims urged the probative value of allowing the jury to see such a photograph was substantially outweighed by the danger of unfair prejudice. Furthermore, according to Sims, any photograph depicting him with his hands handcuffed behind his back was cumulative because the state will have already presented evidence that Sims was placed under arrest. Upon consideration, the trial court denied Sims's motion in limine, and the matter proceeded to trial.
 {¶ 4} During the two-day trial, the state presented the testimony of Ms. Angela Sturdivant, Patrolman Matthew Naegele, Sergeant Dwayne Haavisto, and the two victims of the breaking and entering, Tilden Humphrey and William Graves, while Sims testified on his own behalf.
 {¶ 5} For approximately three months, Ms. Sturdivant was employed as a security guard for Pinkerson Security and was assigned to work at the Winchester Hills apartment complex on October 25, 2000. During her shift, which began at 11 p.m., Ms. Sturdivant was performing outside rounds of the apartment complex when she saw some movement outside of the parking garage. According to Ms. Sturdivant, she saw two subjects wearing black clothing outside of the garage, darting back and forth behind a satellite dish. Ms. Sturdivant, however, conceded to the fact that at the time, she was unclear as to whether she had seen two men or two women.
 {¶ 6} In response to the situation, Ms. Sturdivant acted as if she did not see the individuals "so they wouldn't come my way so I could go in the building and call the police on them." While on the phone with the police, Ms. Sturdivant saw one of the men she had just observed moments before enter the lobby area of the building. According to Ms. Sturdivant, the individual was a tall, thin, young black male wearing a dark colored sweatshirt, dark colored blue jeans, and a dark black hat. That individual was, in fact, Sims.
 {¶ 7} According to Ms. Sturdivant, Sims walked very slowly through the lobby, watching her and then took off running. Although Ms. Sturdivant did not see what direction Sims went, he had two options: (1) proceed towards a door that leads to the parking garage; or (2) travel down a hallway with approximately seven apartment units. In an attempt to locate Sims, Ms. Sturdivant testified that she did not see anyone in this hallway.
 {¶ 8} At approximately 2:23 a.m., on October 25, 2000, Patrolman Naegele and Sergeant Haavisto of the Willoughby Hills Police Department were advised that a security guard at the Winchester Hills apartment complex had seen two males by one of the rear garage doors. In response to the dispatch, Patrolman Naegele and Sergeant Haavisto responded to the scene in separate units.
 {¶ 9} Upon arriving at the apartment complex, Patrolman Naegele proceeded towards a door leading to the garage. When Patrolman Naegele peered through the window of the door, he observed two suspects but could not see what they were doing because it was dark. Nevertheless, Patrolman Naegele saw Sims and another individual identified as Mr. Joseph Glass at an Eagle Talon that was later determined to have been broken into. According to Patrolman Naegele, the vehicle was pulled in with the rear facing the wall, and Sims and Mr. Glass were in between the wall and the rear of the vehicle. Patrolman Naegele observed the men "leaning into the rear of the vehicle crouched behind[,]" and it "looked like they [were] hiding from something."
 {¶ 10} At that point, Sergeant Haavisto started to shake the door at the other end of the garage, causing Sims and Mr. Glass to get very panicky and crouch down behind the vehicle. Patrolman Naegele then pulled the door open, drew his service weapon, entered the parking garage, and ordered the suspects to stop and put their hands up. When Mr. Glass attempted to run, Patrolman Naegele observed him throw a set of allen wrenches and a pair of black leather gloves. In response to the situation, Patrolman Naegele ordered Mr. Glass to stop. Once Mr. Glass was apprehended, a screwdriver and a gray radio trimplate were found on his person. During this time, Sims had dove between the vehicles, and Patrolman Naegele was unable to see his movement.
 {¶ 11} While covering the suspects, Patrolman Naegele opened the door to allow Sergeant Haavisto to enter the garage with his service weapon drawn. Thereafter, Sims was ordered to crawl out from between the vehicles and was handcuffed. In the area where Sims was laying on the ground, Patrolman Naegele noticed a black rubberized flashlight lying next to his hand.
 {¶ 12} While in the process of detaining Sims, he blurted out that "we didn't steal nothing, there is a gray car here, they took the stuff and they already left." As to this, Patrolman Naegele and Sergeant Haavisto indicated that they did not notice a gray vehicle in the area. Sims, however, did not tell Patrolman Naegele "he helped steal the stuff."
 {¶ 13} Once the suspects were apprehended, Ms. Sturdivant acknowledged that "one of [the men] fit the description of the one [she] saw ***." However, Ms. Sturdivant candidly admitted at trial that she was unsure if Sims matched the general description she provided the police:
 {¶ 14} "Q. Now, the person you saw, you did get a good look at the person walking very slowly by the back lobby?
 {¶ 15} "A. Pretty much general description.
 {¶ 16} "Q. Do you recognize that person in Court today?
 {¶ 17} "A. Um, I am not quite sure he fits the general description of [the] one I saw.
 {¶ 18} "Q. When you say `he,' who are you referring to?
 {¶ 19} "A. The young man sitting at the table."
 {¶ 20} During their investigation, the law enforcement officials discovered that the windows to the Eagle Talon were smashed, and the radio was torn out. The second vehicle, an Oldsmobile Cutlass Supreme, also had its windows smashed, and the dashboard was pulled away. In addition, punch marks appeared near the lock area of the trunk. A speaker box, which originated from the Oldsmobile, was recovered at the scene from behind the Eagle Talon.
 {¶ 21} Patrolman Naegele and Sergeant Haavisto confirmed that neither Sims nor Mr. Glass were residents of the Winchester Hills apartment complex; rather, the pair lived in East Cleveland. Based on their police investigation, no one invited Sims or Mr. Glass into the parking garage or into those vehicles. Other than the speaker box and the gray radio trimplate, no other items were recovered at the scene. Furthermore, at the time of his arrest, Sims did not have anything in his actual possession, such as stolen stereo parts. Neither vehicle was dusted for fingerprints.
 {¶ 22} Mr. Humphrey, who resided at the Winchester Hills apartment complex on October 25, 2000, was advised in the early morning hours that his Oldsmobile was broken into. Mr. Humphrey confirmed that stereo equipment was removed from his vehicle, the driver's side window was smashed, and the dashboard was ripped apart. Missing from the vehicle was a tape player, a set of subwoofers, an amplifier, and a C.D. changer. As noted earlier, only the subwoofer was recovered in the parking garage.
 {¶ 23} Mr. Graves was also a resident of the complex and was notified in the early morning hours of October 25, 2000, that his Eagle Talon was broken into. According to Mr. Graves, the radio was half way out, the trunk was ripped apart, and the subwoofer was torn out. The radio trimplate, the subwoofer, an amplifier, a zip drive, and CDs were also removed from the vehicle.
 {¶ 24} At the close of the state's case, Sims took the stand and testified to an entirely different scenario of events from the one relayed by the police officers and the security guard who testified. According to Sims, he went to the Winchester Hills apartment complex on October 25, 2000, to see his girlfriend, Nicole Hass, who lived on the eighth floor. Sims testified he stayed in the apartment building until approximately 2 — 2:30 a.m., when his friend, Mr. Glass, "called [him] downstairs to let [Sims] know that he was downstairs for [his] ride home ***." Sims admitted he was not a resident of the Winchester Hills apartment complex but lived in East Cleveland.
 {¶ 25} According to Sims, he took the elevator to the lobby, and walked past the security guard who was on the phone staring at him. Although Sims thought Mr. Glass was going to pick him up outside, he proceeded through the lobby and towards the parking garage to exit the building.
 {¶ 26} While in the parking garage, Sims claimed he heard his friend Mr. Glass call to him. When Sims approached Mr. Glass, he observed his friend behind the Eagle Talon with the trunk open, picking up a box and setting it on the ground behind the vehicle. After realizing "what [Mr. Glass] was doing," Sims testified that he started to exit the garage and told Mr. Glass that "[he was] going to get out of here."
 {¶ 27} Sims testified that once he started to walk towards the door, he heard a noise at the end of the parking garage. At that point, Patrolman Naegele entered the garage with his service weapon drawn. Furthermore, in direct conflict with Patrolman Naegele and Sergeant Haavisto testimony, Sims claimed that Mr. Glass made the statement that people in a gray vehicle had stolen the property from the vehicles.
 {¶ 28} After hearing all the evidence, the jury found Sims guilty of breaking and entering but not guilty as to the remaining charge of possessing a criminal tool. In a judgment entry dated March 19, 2001, the trial court accepted the jury verdict and referred the matter to the probation department for the preparation of a presentence investigation report and a victim impact statement.
 {¶ 29} Upon conducting a sentencing hearing on April 13, 2001, the trial court imposed a ten-month prison term, which is reflected in the trial court's judgment entry dated April 20, 2001. Although Sims sought to suspend the execution of the sentence pending appeal, the trial court denied such a request. Sims timely appeals his conviction and sentence.
 {¶ 30} For purposes of organization and clarity, we will first address Sims's second assignment of error and then will proceed to consider his three remaining assignments of error. In his second assignment of error, Sims submits his conviction is against the manifest weight of the evidence.
 {¶ 31} When reviewing a claim that the judgment was against the manifest weight of the evidence, we must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, State v. Thompkins (1997),78 Ohio St.3d 380, 387; State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 16.
 {¶ 32} Unlike a sufficiency of the evidence challenge, a manifest weight of the evidence claim contests the believability of the evidence presented. Schlee at 13. Thus, "[t]he issue when reviewing a manifest weight of the evidence challenge is whether there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." State v. Wright (Mar. 29, 2002), 11th Dist. No. 2000-P-0128, 2002 WL 480328, at 4. See, also, State v.Nields (2001), 93 Ohio St.3d 6, 25.
 {¶ 33} In order for an appellate court to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Thompkins at 387.
 {¶ 34} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. Thompkins at 390 (Cook, J. concurring).
 {¶ 35} In the present case, Sims was convicted of breaking and entering. The elements of this offense are: (1) a person by force, stealth, or deception trespasses in an unoccupied structure (2) with the purpose to commit any theft offense or any felony. Contrary to Sims's contention, we conclude the verdict was supported by competent, credible evidence from which the jury could properly have found that he had committed the crime of breaking and entering.
 {¶ 36} As previously mentioned, Ms. Sturdivant observed two individuals outside of the parking garage darting back and forth. Rather than confront these individuals, Ms. Sturdivant notified the police. While on the phone with the authorities, Ms. Sturdivant saw one of the men she had just seen moments before enter the lobby area of the building. The individual she saw was Sims, who was not a tenant of the Winchester Hills apartment complex.
 {¶ 37} While Sims was in the lobby, he watched Ms. Sturdivant and then took off running. Sims, admittedly, entered the parking garage even though he claimed his friend, Mr. Glass, was going to pick him up outside. In fact, Sims did not anticipate that Mr. Glass would be in the parking garage and acknowledged that Mr. Glass did not have access to that area. As explained by Ms. Sturdivant, only residents of the apartment complex were permitted access into the parking garage even though there was no sign posted to indicate this.
 {¶ 38} While in the parking garage, Sims was identified by Patrolman Naegele. Although Sims was not seen breaking into the two vehicles and was not in possession of any stolen property, Patrolman Naegele testified he observed Sims leaning into the rear of the Eagle Talon that was broken into in an attempt to conceal his presence. Accordingly, a reasonable trier of fact could assume that Sims's purpose for breaking in was to commit a theft offense because there were items missing from the vehicles. State v. Lee (May 3, 2001), 8th Dist. No. 77945, 2001 Ohio App. LEXIS 1997, at 5.
 {¶ 39} Importantly, Ms. Sturdivant indicated at trial that she was unsure if Sims matched the general description she provided to the police. However, Sergeant Haavisto confirmed that Sims matched the description provided by the dispatch from Ms. Sturdivant. Moreover, the weight to be given to the evidence and the witnesses's credibility are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 40} The foregoing discussion highlights that the state presented substantial evidence upon which a jury could reasonably conclude, beyond a reasonable doubt, that Sims committed the offense of breaking and entering. Although circumstantial, the evidence here pointed strongly to Sims. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. As a result, Sims's second assignment of error is meritless.
 {¶ 41} Turning to his first assignment of error, Sims challenges the instructions provided to the jury on three distinct bases. First Sims argues a complicity instruction was not warranted. Next, Sims argues the trial court erroneously defined the word "stealth." Finally, Sims argues an instruction on "stealth" was inappropriate. We will discuss each in turn.
 {¶ 42} As part of its charge to the jury, the trial court instructed the jury it could find Sims guilty of breaking and entering if it found that he had aided and abetted in the commission of this offense. Sims, however, contends the complicity instruction was not warranted because the evidence presented at trial did not support such an instruction.
 {¶ 43} A complicity instruction can be given even when a defendant has been charged as a principal offender in the indictment. R.C.2923.03(F); State v. Tumbleson (1995), 105 Ohio App.3d 693, 697; Statev. Weaver (June 28, 1996), 11th Dist. No. 94-L-008, 1996 WL 648752, at 4. R.C. 2923.03(A)(2), provides that "[n]o person, acting with the kind of culpability for the commission of the offense, shall *** [a]id or abet another in committing the offense[.]" To prove the principal offense of breaking and entering, the state must prove that the offender, by force, stealth, or deception, trespasses in an unoccupied structure with the purpose to commit any theft offense or any felony. R.C. 2911.13(A).
 {¶ 44} Although the phrase "aid and abet" is not defined in the complicity statute, "the courts of this state have generally held that a criminal defendant has acted as an aider and abettor if he has assisted, incited or encouraged another person to commit the offense." Weaver at 4. See, also, State v. McKnight, 8th Dist. No. 01CA556, 2002-Ohio-1971, at ¶ 22. However, a person's mere association with the principal offender is not enough. State v. Mootispaw (1996), 110 Ohio App.3d 566,570; McKnight at ¶ 22. Rather, the state must establish that the offender "took some affirmative action to assist, encourage, or participate in the crime by some act, deed, word, or gesture. Mere presence at the scene or subsequent physical proximity to the stolen item is not sufficient ***." Mootispaw at 570. See, also, McKnight at ¶ 22.
 {¶ 45} Furthermore, "the state may demonstrate a person's aiding and abetting of another in the commission of a crime through both direct and circumstantial evidence." Mootispaw at 570. See, also, McKnight at ¶ 23. "`[C]riminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'"Mootispaw at 570, quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34. See, also, McKnight at ¶ 23.
 {¶ 46} We are mindful that "a trial court does not err in giving a complicity instruction if the jury could reasonably find from the evidence presented that the defendant had aided and abetted in the commission of the crime." Weaver at 4. As to this point, the state urges that the testimony of Ms. Sturdivant, Patrolman Naegele, and Sergeant Haavisto supported an instruction that Sims assisted, incited, or encouraged Mr. Glass in committing the offense of breaking and entering.
 {¶ 47} At trial, Ms. Sturdivant testified that during her shift, she observed two subjects wearing dark clothing outside of the garage darting back and forth behind a satellite dish, which was located near a pedestrian entrance to the apartment building's garage. Upon returning to the apartment complex to call the police, Ms. Sturdivant saw one of the men she had just seen moments before come into the building. That individual was Sims.
 {¶ 48} According to Ms. Sturdivant, Sims watched her while he walked very slowly through the lobby and then took off running towards either the parking garage or a separate apartment unit. Through Sims's own admission at trial, he entered the lobby of the apartment complex and proceeded towards the parking garage even though Sims claimed that Mr. Glass was going to pick him up outside. Ms. Sturdivant further explained that only residents of the apartment complex were permitted access into the parking garage.
 {¶ 49} Sergeant Haavisto testified that after he arrived on the scene, he attempted to enter the garage through the door located near the satellite dish, but it was locked. When he was unable to gain entry through that door, Sergeant Haavisto attempted to enter the garage though the same door used by Patrolman Naegele. However, that door had locked behind Patrolman Naegele. As a result, Sergeant Haavisto entered the garage by knocking on the window so that Patrolman Naegele could open the door for him.
 {¶ 50} While at the scene, Patrolman Naegele observed Sims and Mr. Glass in the parking garage "leaning into the rear of [the Eagle Talon] crouched behind," and it appeared as if they were hiding. Upon entering the garage, Patrolman Naegele ordered the suspects to stop and put their hands up, but Sims dove between the cars. In the area where Sims was laying on the ground, Patrolman Naegele noticed a black rubberized flashlight lying next to his hand. In addition, Patrolman Naegele observed Mr. Glass throw a set of allen wrenches and a pair of black leather gloves. Once Mr. Glass was apprehended, a screwdriver and a gray radio trimplate were found on his person.
 {¶ 51} According to Patrolman Naegele and Sergeant Haavisto, after Sims was apprehended, he blurted out that he did not steal anything, that the people he was with took the property and were traveling in a gray Oldsmobile. Patrolman Naegele, however, conceded to the fact that "[Sims] didn't tell [him] he helped steal the stuff."
 {¶ 52} These facts, when considered in their totality, provide substantial circumstantial and direct evidence to support an inference that Sims walked through the lobby and entered the garage to assist Mr. Glass in accessing the garage and to aid him in stealing and/or attempting to steal portions of the interior of the vehicles parked in the garage. The combination of the testimony rendered by Ms. Sturdivant, Sergeant Haavisto and Patrolman Naegele could reasonably be found to have proven Sims guilty as an aider and abettor; therefore, a jury instruction on complicity was proper. State v. Perryman (1976), 49 Ohio St.2d 14, paragraph five of the syllabus.
 {¶ 53} Sims next contends the trial court erroneously defined "stealth" because the phrase "to remain within" is not contained in the Ohio Jury Instruction and is not a correct statement of the law.
 {¶ 54} Pursuant to R.C. 2911.13(A), breaking and entering occurs when a person, by force, stealth, or deception, trespasses in an unoccupied structure with the purpose to commit any theft offense or any felony. In relation to this offense, the trial court defined stealth as "any secret, sly, or clandestine act, to gain entrance or to remainwithin an unoccupied structure." (Emphasis added.)
 {¶ 55} R.C. 2911.13 does not define the term stealth. For purposes of an aggravated burglary offense, stealth has been defined as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission."State v. Lane (1976), 50 Ohio App.2d 41, 47. According to the Tenth Appellate District, "[t]his is a proper definition of the word and is the one which the average person would understand the word to mean ***." Id.
 {¶ 56} Recently, a number of our sister appellate courts have applied the Lane definition of the term stealth to the offense of breaking and entering:
 {¶ 57} "Stealth has been defined as `any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a [structure] of another without permission.'" State v. Davis
(Mar. 22, 2002), 1st Dist. No. C-010477, 2002 WL 440790, at 4. See, also, State v. Isom (Nov. 29, 2001), 8th Dist. No. 78959, 2001 Ohio App. LEXIS 5312, at 10; In re Markunes (Sept. 20, 1996), 2nd Dist. Nos. 15601 and 15617, 1996 WL 531586, at 5.
 {¶ 58} We conclude the definition of the term stealth as provided by the trial court is consistent with both the Ohio Jury Instructions and the holdings of numerous Ohio courts.[1] Accordingly, the charge given to the jury was based on a correct statement of the law.
 {¶ 59} Finally, Sims maintains the trial court erred by instructing the jury on the element of stealth as there was no evidence presented that he obtained entrance to the garage by stealth. According to Sims, he did not attempt to conceal his intentions when he walked past the security guard, opened the unlocked door, and entered the garage.
 {¶ 60} "A trial court must fully and completely give only those instructions that are relevant and necessary for the jury to weigh all the evidence." State v. Cisternino (Mar. 30, 2001), 11th Dist. No. 99-L-137, 2001 WL 314798, at 6. "Jury instructions should contain plain, unambiguous statements of the law applicable to the case and evidence presented to the jury. *** The jury instructions provided by the trial court must be confined to the issues raised by the pleadings and the evidence. *** The trial court may not instruct a jury where there is no evidence to support a particular issue." (Citations omitted.) State v.Kirin (Aug. 11, 2000), 11th Dist. No. 99-T-0054, 2000 WL 1140161, at 3.
 {¶ 61} For purposes of appellate review, "[t]he decision to issue a particular jury instruction rests within the sound discretion of the trial court." State v. Huckabee (Mar. 9, 2001), 11th Dist. No. 99-G-2252, 2001 WL 253048, at 6. Absent an abuse of discretion, this court will not reverse a decision concerning the giving of jury instructions. Id.
 {¶ 62} At trial, it was established that Sims was not a resident of the apartment complex. In addition, Sims was not accompanied by a resident when he entered the garage. Nor did he have permission from the security guard to be in the garage. When Sims entered the lobby area of the building, he walked very slowly, watched Ms. Sturdivant while she was on the phone with the police, then took off running and entered the parking garage. Sims entered the garage even though he claimed that Mr. Glass was going to pick him up outside. Furthermore, neither Sims nor Mr. Glass had a vehicle parked in the garage. In short, Sims had no legitimate purpose for being in the garage. Such evidence produces a reasonable inference that Sims was using stealth to gain access into the parking garage.
 {¶ 63} In summation, the jury instruction on complicity was proper; the definition of stealth as provided by the trial court was a correct statement of the law; and the state presented evidence that Sims accessed the parking garage through stealth to warrant a jury instruction on such. Sims's first assignment of error is, therefore, meritless.
 {¶ 64} Sims's third assignment of error challenges the trial court's denial of Sims's motion in limine to exclude any photograph that depicts Sims with his hands handcuffed behind his back. According to Sims, the trial court should have excluded this photograph on the basis that it was prejudicial and cumulative as the state already admitted testimony that he was placed under arrest.
 {¶ 65} "A denial of a motion in limine does not preserve error for review. A proper objection must be raised at trial to preserve error."State v. Brown (1988), 38 Ohio St.3d 305, 311-312. See, also, State v.Brock (June 26, 1998), 11th Dist. No. 96-T-5564, 1998 WL 553033, at 7. In the case sub judice, Sims raised his objection at trial when the state moved to admit the photograph into evidence. As such, Sims properly preserved the instant issue for purposes of appellate review.
 {¶ 66} It is axiomatic that the admission of photographs rests within the sound discretion of the trial court. As such, the trial court's ruling on this matter will not be disturbed on appeal absent an abuse of discretion and a clear showing of prejudice to the defendant.State v. Noling (June 30, 1999), 11th Dist. No. 96-P-0126, 1999 WL 454476, at 22. Furthermore, the trial court may admit photographs as long as the probative value of such photographs outweighs the danger of material prejudice to the defendant. State v. Slagle (1992),65 Ohio St.3d 597, 601.
 {¶ 67} Contrary to Sims's contention, a review of the following exchange at trial indicates that the photograph of Sims was admitted to show the clothing he was wearing, not to demonstrate that he was arrested:
 {¶ 68} "Q. [by prosecuting attorney]: *** Sgt. Haavisto, did you have an opportunity to take photographs while at the apartment garage that evening on the 25th of October, 2000?
 {¶ 69} "A. [by Sergeant Haavisto]: Yes, I did, I took several Polaroid photos of both suspects sitting on the ground after and before they were placed inside the police cars. ***
 {¶ 70} "Q. Now, speaking [of] the individuals, you said you photographed them shortly after they were taken into custody?
 {¶ 71} "A. That's correct.
 {¶ 72} "***
 {¶ 73} "Q. Relative to these cars, can you tell me from your memory where you photographed him [Sims]?
 {¶ 74} "A. When he was handcuffed, if I remember correctly, Officer Naegele had him crawl out between [the] cars so we weren't dealing [with] him in that close quarters. I think by the time he's handcuffed, turned around, sat up, he was probably in front of the car next to the door they broke into in that area. By the time, I believe, he's sitting on the ground handcuffed, that's probably where the Polaroid picture is taken in that area, within probably 10, 15 feet of the cars that were broken into.
 {¶ 75} "Q. I'm going to hand you what's been marked [as] State's Exhibit 9, Sergeant, do you recognize that photograph?
 {¶ 76} "A. Yes, I do. It's a picture of the Defendant, Sims, right after he was handcuffed.
 {¶ 77} "Q. Is that the same individual that you saw between [the] cars, mainly the Eagle Talon, and the other car next to it?
 {¶ 78} "A. Yes.
 {¶ 79} "Q. Do you see the same individual in Court today?
 {¶ 80} "A. Yes.
 {¶ 81} "***
 {¶ 82} "Q. Can you describe for the Jury what Mr. Sims is wearing in that picture?
 {¶ 83} "A. Um, blue jeans and a dark sweatshirt, hard to tell color, and could be black — I don't recall if it was black or a dark shade of blue — looks something like dark in color with words of some type, a medium blue graphic on the front, and looks like a dark cap.
 {¶ 84} "Q. Does that match the description, from your memory, that dispatch gave you from the security guard at Winchester Hills Apartments?
 {¶ 85} "A. Yes, the description was dark clothing."
 {¶ 86} It is also evident from the above exchange that the photograph in question was not prejudicial as it was used for the purpose of identifying Sims as he appeared on October 25, 2000. See, e.g., Slagle at 602 (holding that the trial court properly allowed into evidence photographs of defendant at the crime scene, depicting him handcuffed and wearing no shirt with blood stains on his hands and underwear as well as numerous bruises and scratches on his body when the photograph accompanied an officers' testimony regarding, among other things, the identity of the perpetrator); State v. Papp (1978), 64 Ohio App.2d 203,212-213 (holding that the admission of a photograph featuring defendant handcuffed with body belt, prison clothes, and flanked by two sheriffs deputies did not constitute prejudicial error when the photograph was used for identification purposes).
 {¶ 87} Moreover, this photograph was relevant and not cumulative as it aided the jury to determine whether Ms. Sturdivant provided an accurate description of Sims to the police in light of the fact that she was unable to positively identify Sims at trial.
 {¶ 88} Given that Sims has failed to demonstrate that the photograph admitted over defense objection was unfairly prejudicial or cumulative, we conclude the third assignment of error is without merit.
 {¶ 89} In the fourth and final assignment of error, Sims challenges the imposition of more than the minimum sentence.[2] We begin by noting that in accordance with R.C. 2953.08, our review of a felony sentence is de novo. As such, we will not disturb Sims's sentence unless we find, by clear and convincing evidence, that the record does not support the sentence or that the sentence is contrary to law. Statev. Bradford (June 2, 2001), 11th Dist. No. 2000-L-103, 2001 WL 589271, at 1. Clear and convincing evidence is that evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Id.
 {¶ 90} R.C. 2929.14(B) requires a sentencing court to impose the minimum sentence for an offender who has not previously served a prison term unless it specifies on the record that the shortest prison term would demean the seriousness of the conduct or would not adequately protect the public from future crime by the offender. According to Statev. Edmonson (1999), 86 Ohio St.3d 324, syllabus, a sentencing court imposing a prison term greater than the minimum is not required to give the underlying reasons on the record. Bradford at 3. Rather, it is sufficient that the record reflects that the court engaged in the statutory analysis and found either or both of the R.C. 2929.14(B) exceptions warranted a sentence greater than the minimum. Bradford at 3.
 {¶ 91} In the present case, the trial court duly noted that Sims had previously served a prison term as documented by the presentence investigation report. Thus, the trial court was not necessarily required to impose a minimum sentence or make the findings enumerated under R.C.2929.14(B). In spite of that fact, the trial court still determined that "the shortest term [would] demean the seriousness of [Sims's] conduct, and the shortest prison term [would] not adequately protect the public from future crime by [Sims] or others."
 {¶ 92} As to this point, Sims submits that the factors set forth in R.C. 2929.12 relating to the seriousness of the conduct and the likelihood of recidivism do not support the imposition of more than the minimum sentence. In other words, Sims believes that the record does not support such a sentence.
 {¶ 93} After reviewing the evidence presented at the sentencing hearing, the presentence investigation report, and the victim impact statement, we conclude the record does support the imposition of more than the minimum sentence for the fifth degree felony.
 {¶ 94} Admittedly, Sims, a twenty-six years old high school graduate, attended two years of college and has attempted to start his own business. However, Sims has not led a law-abiding life as evidenced by his extensive criminal history, which includes carrying a concealed weapon, receiving stolen property, possession of a criminal tool, attempted trafficking in drugs, and domestic violence. Apparently, Sims has not responded favorably to previously imposed sanctions, such as probation and prison. In addition, Sims has a lengthy traffic record consisting of seven instances of driving under suspensions.
 {¶ 95} While Sims tested negative for illegal drugs and reported no history of drug and/or alcohol abuse, he has a prior conviction for attempted trafficking in drugs, to wit: marijuana. The presentence investigation report also indicates that Sims was polite and cooperative during the proceeding. Sims, however, did not exhibit any genuine remorse for the instant offense. Rather, Sims denied involvement and claimed that he was convicted because he was in the wrong place, at the wrong time, with the wrong person. In fact, pursuant to the presentence investigation report, Sims minimized all his past offenses and "had explanations for all his past offenses, claiming that he either did not know it was stolen or that the police had the wrong guy."
 {¶ 96} Finally, although no physical harm occurred, the victims suffered serious economic harm as a result of the offense. Specifically, Mr. Humphrey reported in his victim impact statement that the estimated value of property lost totaled $1,800 — $1,900.
 {¶ 97} Therefore, we conclude the record does adequately support the trial court's decision to impose a ten-month sentence, which was more than the minimum and less than the maximum for a felony of the fifth degree. Accordingly, Sims's fourth assignment of error is meritless.
 {¶ 98} Based on the foregoing analysis, Sims's four assignments of error are without merit, and the judgment of the trial court is affirmed.
DONALD R. FORD and DIANE V. GRENDELL, JJ., concur.
[1] For purpose of the breaking and entering offense, the Ohio Jury Instruction defines stealth as "any secret or sly act to gain entrance." 4 Ohio Jury Instructions (2002) 384, Section 511.13(A).
[2] R.C. 2929.14 delineates guidelines for the length of prison terms. The permissible sentencing range for a felony of the fifth degree ranges from six to twelve months. Contrary to Sims's contention, he was sentenced to a term of ten months, not eleven months. Despite that fact, the sentence imposed was beyond the minimum sentences permitted by statute.